# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
January 23, 2013 Session

## IN RE: DACIA S., ET AL.

**Appeal from the Juvenile Court for Hamilton County**
**Nos. 245942, 245943, 245944      Suzanne Bailey, Judge**

**No. E2012-01337-COA-R3-PT-FILED-FEBRUARY 26, 2013**

The State of Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Donald R.S., Jr.[1] ("Father") to the minor children Dacia S., Aerial W.[2], and Teagan W.[3]  After a trial, the Trial Court entered its order terminating Father's parental rights to the Children after finding and holding, *inter alia*, that DCS had proven by clear and convincing evidence that grounds existed to terminate Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv) and that the termination was in the Children's best interest.  Father appeals to this Court.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and JOHN W. MCCLARTY, J., joined.

---

[1]In the record, Father is sometimes referred to as "Donald R.S., Jr." and sometimes as "Donnie R.S., Jr."  DCS also sought to terminate the parental rights of the Children's biological mother Sheila W. ("Mother").  The Trial Court terminated Mother's parental rights to the Children, and we affirmed the termination in *In re: Dacia S.*, No. E2012-01797-COA-R3-PT filed on February 14, 2013.

[2]Within the record on appeal Aerial is sometimes referred to using Father's surname and sometimes referred to using Mother's surname.  Aerial's birth certificate is not included in the record on appeal.  Within this Opinion we refer to Aerial W. with the understanding that we are referring to the child Aerial S. a/k/a Aerial W.

[3]Within the record on appeal Teagan is sometimes referred to using Father's surname and sometimes referred to using Mother's surname.  Teagan's birth certificate is not included in the record on appeal. Within this Opinion we refer to Teagan W. with the understanding that we are referring to the child Teagan S. a/k/a Teagan W.

Cara C. Welsh, Chattanooga, Tennessee, for the appellant, Donnie R.S., Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; and Alexander S. Rieger, Assistant Attorney General for the appellee, State of Tennessee Department of Children's Services.

**OPINION**

**Background**

The Children were taken into State custody on December 14, 2009 because they were living in a car with Mother. DCS filed the petition seeking to terminate Father's parental rights to the Children in September of 2011. The case proceeded to trial in April of 2012.

Father, who is serving time in federal prison where he has been incarcerated since April of 2010, testified at trial by telephone. Father pled guilty to a charge of conspiracy of manufacturing methamphetamine and was sentenced to 40 months. Father testified that he expected to be released in November of 2012. While Father testified that this was his first conviction, he admitted that he "had a problem with methamphetamine for 14 years." Father testified he has "been locked up ever since, pretty much, January of 2010." Father admitted that he knew while he was doing drugs that the Children were with Mother and that Mother was having mental issues.

Father has not seen the Children since late 2009. He testified that before he was locked up he bought things for the Children, but that he did not give Mother any money to support the Children.

Father testified that he has a job when he gets released from prison. He stated that he worked for Century 21 in Dunlap, Tennessee and that he had built houses for 14 years. Father testified about his plans for when he is released stating:

> Ma'am, I don't even want to go back to Dunlap; I was wanting to actually go back to work for Jeremy Slayden in Chattanooga. He done told me he would give me my job back with him. I worked for them for seven straight years, Slayden Construction. And I was going to get me a home right there while I'm at the halfway house and go ahead and just move to Chattanooga, Hamilton County. I think it would be best for me and my children.

Father plans to live with his mother and her boyfriend when he is released until he earns a couple of paychecks and can get his own place.

Father had temporary legal custody of the Children in 2008. He explained:

I had to go down - - I had got a call and [Mother] was down at one of them homeless shelter places, and the State was there and they were about to take my kids, so I come and I got them and went through the stuff, went to court and got temporary custody.

And the only reason I ended up giving her the kids back was because she got out of Moccasin Bend, she seemed to me to be stable, and every time I'd bring the kids and let her see them on the weekend, she would start crying and tell me, "Please, Junior, don't take my children from me." And I said, "I'm not going to."

So I ended up - - I had drug problems. I never done drugs around my kids, sir. I want to get that on the record. I had a drug problem. So I didn't want to see her break down again, so I thought the right thing to do was to give her the kids back at the time. Well, and then I ended up getting in trouble for this drug charge and everything. So everything's went crazy.

But I thank God for me coming to prison because I have gotten my life together now. I'm a different person now, I really am, and all I want to do, sir, is to get out of here and be a father to my kids that I never was.

Father testified "I didn't go around my children on drugs, sir," but admitted that he was doing methamphetamine "[p]robably every other day." He admitted this was true up until the time he went to jail. When asked how long it has been since he took methamphetamine, Father stated:

Well, I've been locked up since January of 2010. I got out - - and I was in jail for child support for my first son in Dunlap because of this here, all this that's going on, and then I come straight to prison in March. I think it was March the - - no, April the 21st. I've been in custody ever since April the 21st.

Father has a 13 year old son in addition to the Children. Father testified: "I think that I should get a second opportunity to be a father of my kids I never was. I mean, yes, sir, everybody messes up. Everybody is only human, you know? Sir, I promise you I'm not that person no more, I'm really not."

-3-

Father was asked if Mother was a suitable person to have custody of the Children, and he stated:

> She is definitely not suitable to have my children. I look at that now. I see what's happened. She had them back, like I said, sir. I talked to them, I think - - the last time I talked to my children was the first of April of last year, and I know, when I called, that she didn't sound right again.
>
> I said, "[Mother], just please hold it together until I get out of here, and I promise I'll take care of y'all." I said, "because if you lose our kids again, we're probably not going to get them back."
>
> But, no, sir. What's happened, I know I messed up, but I've come and I've done my time for my charge and I have got rehabilitated, and I think I deserve a second opportunity. She had her second opportunity, and she lost my children again, and now it's about to cost me to lose them.

Father stated: "I've always took care of my kids.… I mean, I fed them; I kept them clothed; I kept a roof over their head; I took them to the park." Father was asked how often he saw the Children when the Children were in Mother's custody, and he stated: "Well, me and her mom didn't get along, and I didn't go over there a whole lot. Probably once a week. Sometimes two times a week." Father admitted that Teagan had not been born when he had custody of the Children in 2008 and so he had custody just of Dacia and Aerial. Father admitted that he knew that Mother was having serious mental health issues prior to Teagan's birth.

The Children originally were taken into State custody approximately one month before Father was arrested. Father admitted that he knew the Children were in State custody before he was arrested. The last time Father saw the Children prior to his arrest was in September of 2009. Teagan was approximately six months old when Father last saw the Children.

Father was asked about his drug use and conviction, and he stated:

> Actually, ma'am, I wasn't cooking meth. No, ma'am. That's not right.… Well, I had a - - I got a conspiracy case. And conspiracy is when somebody says that you've done something. You don't have to - - I didn't get caught with anything, ma'am. I got arrested because of hearsay. I got conspiracy of manufacturing methamphetamine charge, yes, ma'am. I'm guilty of that, one hundred.

But I didn't get caught with anything. I got arrested. I got indicted because of somebody that I know that did do drugs said that we cooked dope together, so I got picked up on it and I got convicted of it because I testified and I told them the problem I had with methamphetamine, ma'am. I took responsibility of my problem.

Father was asked if he took responsibility for the conspiracy of being involved in the manufacturing of methamphetamines, and he stated: "Yes, ma'am. I took full responsibility because I was guilty of it."

Renita Underwood, the DCS caseworker for the Children, testified at trial. Ms. Underwood was assigned to this case approximately six months after the Children came into State custody and has remained the caseworker since that time. The Children have no mental health or educational issues. Ms. Underwood testified that the Children are in a foster home where they have been since they entered State custody[4] and that they are doing well. The Children are bonded to the foster family, and Ms. Underwood testified that this is a potential adoptive family for the Children.

Ms. Underwood has had limited contact with Father. She sent him two letters and has spoken to him on the phone once. Father never sent any cards for the Children or any letters asking about how the Children are doing.

Ms. Underwood was asked why DCS sought to terminate Father's parental rights to the Children, and she testified:

Just that [the Children] are very bonded with their foster family. This is a stable environment. Just given the fact that [Father] said he had drug use for 14 years and given the fact that the mother's mental health, I think it's almost like they were like taking turns. They knew the situation.

He had a drug problem. The mother had a mental problem. It's been ongoing for both parents for a long period of time. And it seems like it's just been unstable. And these children are in a stable placement where they are very bonded and very loved. And I think if we remove these children from this house, it will be detrimental on them.

---

[4]In February of 2011, the Children began a trial home visit in Mother's home. The trial home visit was terminated in April of 2011. We discuss the trial home visit in detail in *In re: Dacia S.*, No. E2012-01797-COA-R3-PT. Other than the period of this trial home visit with Mother, the Children have remained in the same foster home.

For one, Teagan doesn't even know [Father]. Aerial will probably recognize him a little. I would give that Dacia would be the one that really would recognize [Father] the most. And I do think it'd be very emotional on these children to just remove them from the home they've been in.

Donna O. ("Foster Mother"), the Children's foster mother, testified at trial. The Foster Mother testified that her household consists of herself, her husband, their 19 year old daughter, and the Children. The Children have been in her home for two years and three months and the Foster Mother stated: "we love them." The Foster Mother testified that she and her husband want to adopt the Children. The youngest of the Children was 11 months old when the Children first were placed in the foster home and the two older children were 3 and 4 years old respectively. The Foster Mother testified that the middle child "does have nightmares at times and they are always about the mother. And they are about the mother - - me leaving her or something accidentally and the mom finding her."

After trial, the Trial Court entered its Order of Termination of Parental Rights and Final Decree of Partial Guardianship on May 30, 2012 finding and holding, *inter alia*:

4. Grounds for terminating the parental rights of [Father] to [the Children] exist pursuant to T.C.A. § 36-1-113(g)(1) and T.C.A. § 36-1-102(1)(A)(iv) in that Father has abandoned the children by way of his incarceration.

Specifically, the Father was incarcerated all of the four (4) months prior to the filing of the Petition, and is serving a forty (40) month federal sentence for Conspiracy to Manufacture, Distribute and Possess with Intent to Distribute Five (5) Grams or More of Methamphetamine Actual and Fifty (50) Grams or more of Methamphetamine Mixture. Upon his release he will be on supervised probation for a term of five (5) years.

The Father engaged in criminal conduct prior to his incarceration that exhibits wanton disregard for the children's welfare. Specifically, he sought emergency custody of the children Aerial and Dacia after the mother was committed to a mental health institution and thus he was aware of her mental instability and inability to care for the children. He returned the children to her care, however, upon her release from the institution and the children were subsequently taken into state custody some months later due to deterioration of the Mother's mental health and allegations that she was living in her car with the children in freezing weather.

-6-

One week after the children were taken into foster care, the criminal charges for which the Father is currently incarcerated were filed against him. He testified he has had a "problem with Meth" for fourteen (14) years and that he was doing Meth every other day prior to being incarcerated but "never did drugs in front of the children."

His actions of engaging in illegal drug activity and substance abuse after gaining custody of the children while he was aware of the mother's mental health issues and instability demonstrates a wanton disregard for the welfare of his children. He cannot currently offer them a safe and stable home and it is unknown whether he is able to remain clean and sober outside of being incarcerated.

5. Grounds for terminating the parental rights of [Father] to [the Children] exist pursuant to T.C.A. § 36-1-113(i) in that it is in the best interests of the children for the Father's rights to be terminated, specifically:

The Father had not had a significant relationship with the youngest child, Teagan. That child was born after the Father's short period of gaining temporary physical custody of the children, and he was incarcerated before that child turned one. During that time, when the Mother lived with her mother, he states he did not visit because he and the maternal grandmother did not get along. Father further testified he only saw the children a few times in 2009 and he last saw the children in September, 2009. The only time he has had a relationship with the children has been during the short period in which he had them in his physical custody. Both prior to and after that, he has not had a significant relationship with any of them.

The Father has a long history of drug use and it is unknown if and when he would ever be able to create a safe and stable home for the children. He is currently incarcerated in Federal prison and testified he would not be released until at least November 2012, and then would be in a half-way house prior to beginning his probationary period. He has completed a drug program while incarcerated but it is unknown whether he is able to maintain sobriety outside of incarceration.

A change of caretakers and home is likely to have a highly negative effect on the children. The Father is not bonded to the children in a meaningful way. The Father has not had any visits since being incarcerated and did not have significant visitation prior to that. He has not sent letters or

cards to the children during their time in state custody. The children are in a loving adoptive home where they have been since they were placed in DCS custody. The foster parents love them and all of their needs are being met. They are doing very well in the foster home; they are growing and meeting all of their developmental milestones.

The Father has shown brutality, abuse and neglect toward the children by using drugs both during and after their birth, and being incarcerated for the same, and by not being involved in their lives.

The environment of the Father's home is unknown, and it is unknown whether he will be able to create a stable, safe home for the children due to his years of drug abuse. It is unknown whether his issues will be ongoing upon his release, and any ongoing drug issues would create a fully unhealthy and unsafe environment.

The Father's failure to protect the children from the emotional and mental instability of the Mother has been detrimental to the children in the past and raises [a] question as to whether or not he could effectively provide a safe and stable home for the children upon his release from prison. His failure to consistently and appropriately address his history of addiction before incarceration and his failure to provide a safe, stable home for the children free from the Mother's instability and mental health issues further demonstrate his inability to parent the children. He has not put the children first and the concerns related to his parenting are ongoing.

Pursuant to T.C.A. § 36-1-113(i), and for the reasons detailed above, it is in the best interests of the children and the public that all the parental rights of [Father] to [the Children] be forever terminated ….

Father appeals the termination of his parental rights to the Children.

## **Discussion**

Although not stated exactly as such, Father raises three issues on appeal: 1) whether the Trial Court erred in finding that clear and convincing evidence existed to terminate Father's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv); 2) whether the Trial Court erred in finding that clear and convincing evidence existed that it was in the Children's best interest for Father's parental rights to be terminated; and, 3) whether the Trial Court erred in

terminating Father's parental rights to the Children when DCS did not prove that it made reasonable efforts to assist Father.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

> Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination

-9-

of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at \*\*16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first will address whether the Trial Court erred in finding that clear and convincing evidence existed to terminate Father's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv). In pertinent part, Tenn. Code Ann. § 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> * * *
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g) (Supp. 2012). As pertinent to this appeal, Tenn. Code Ann. § 36-1-102(1)(A)(iv) provides:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> * * *
>
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either had willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's

-10-

incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; ….

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2010).

The Trial Court found that Father had engaged in conduct prior to his incarceration that exhibited wanton disregard for the welfare of the Children. Specifically, the Trial Court made detailed findings with regard to this issue including:

Specifically, the Father was incarcerated all of the four (4) months prior to the filing of the Petition, and is serving a forty (40) month federal sentence for Conspiracy to Manufacture, Distribute and Possess with Intent to Distribute Five (5) Grams or More of Methamphetamine Actual and Fifty (50) Grams or more of Methamphetamine Mixture. Upon his release he will be on supervised probation for a term of five (5) years.

The Father engaged in criminal conduct prior to his incarceration that exhibits wanton disregard for the children's welfare. Specifically, he sought emergency custody of the children Aerial and Dacia after the mother was committed to a mental health institution and thus he was aware of her mental instability and inability to care for the children. He returned the children to her care, however, upon her release from the institution and the children were subsequently taken into state custody some months later due to deterioration of the Mother's mental health and allegations that she was living in her car with the children in freezing weather.

One week after the children were taken into foster care, the criminal charges for which the Father is currently incarcerated were filed against him. He testified he has had a "problem with Meth" for fourteen (14) years and that he was doing Meth every other day prior to being incarcerated but "never did drugs in front of the children."

His actions of engaging in illegal drug activity and substance abuse after gaining custody of the children while he was aware of the mother's mental health issues and instability demonstrates a wanton disregard for the welfare of his children. He cannot currently offer them a safe and stable home and it is unknown whether he is able to remain clean and sober outside of being incarcerated.

The evidence in the record on appeal does not preponderate against these findings made by the Trial Court by clear and convincing evidence. We, therefore, find no error in the Trial Court's holding that grounds had been proven to terminated Father's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv).

We next consider whether the Trial Court erred in finding that clear and convincing evidence existed that it was in the Children's best interest for Father's parental rights to be terminated. With regard to this issue the Trial Court specifically found and held:

The Father had not had a significant relationship with the youngest child, Teagan. That child was born after the Father's short period of gaining temporary physical custody of the children, and he was incarcerated before that child turned one. During that time, when the Mother lived with her mother, he states he did not visit because he and the maternal grandmother did not get along. Father further testified he only saw the children a few times in 2009 and he last saw the children in September, 2009. The only time he has had a relationship with the children has been during the short period in which he had them in his physical custody. Both prior to and after that, he has not had a significant relationship with any of them.

The Father has a long history of drug use and it is unknown if and when he would ever be able to create a safe and stable home for the children. He is currently incarcerated in Federal prison and testified he would not be released until at least November 2012, and then would be in a half-way house prior to beginning his probationary period. He has completed a drug program while incarcerated but it is unknown whether he is able to maintain sobriety outside of incarceration.

A change of caretakers and home is likely to have a highly negative effect on the children. The Father is not bonded to the children in a meaningful way. The Father has not had any visits since being incarcerated and did not have significant visitation prior to that. He has not sent letters or cards to the children during their time in state custody. The children are in a loving adoptive home where they have been since they were placed in DCS custody. The foster parents love them and all of their needs are being met. They are doing very well in the foster home; they are growing and meeting all of their developmental milestones.

The Father has shown brutality, abuse and neglect toward the children by using drugs both during and after their birth, and being incarcerated for the same, and by not being involved in their lives.

The environment of the Father's home is unknown, and it is unknown whether he will be able to create a stable, safe home for the children due to his years of drug abuse. It is unknown whether his issues will be ongoing upon his release, and any ongoing drug issues would create a fully unhealthy and unsafe environment.

The Father's failure to protect the children from the emotional and mental instability of the Mother has been detrimental to the children in the past and raises [a] question as to whether or not he could effectively provide a safe and stable home for the children upon his release from prison. His failure to consistently and appropriately address his history of addiction before incarceration and his failure to provide a safe, stable home for the children free from the Mother's instability and mental health issues further demonstrate his inability to parent the children. He has not put the children first and the concerns related to his parenting are ongoing.

The record on appeal reveals that the Trial Court carefully considered the relevant factors including those contained in Tenn. Code Ann. § 36-1-113(i). The evidence in the record does not preponderate against these findings made by the Trial Court by clear and convincing evidence. We find no error in the Trial Court's determination that it is in the Children's best interest for Father's parental rights to be terminated.

Finally, we address the issue of whether the Trial Court erred in terminating Father's parental rights to the Children when DCS did not prove that it made reasonable efforts to assist Father. In his brief on appeal Father argues that DCS failed to exercise reasonable efforts to assist him pursuant to Tenn. Code Ann. § 37-1-166(g)(1) and also argues that because of this failure his due process rights were violated.

As pertinent to this appeal, Tenn. Code Ann. § 37-1-166 provides:

(4) Reasonable efforts of the type described in subdivision (g)(2) shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that:

(A) The parent has subjected the child that is the subject of the petition or any sibling or half-sibling of the child who is the subject of the petition or any

other child residing temporarily or permanently in the home to aggravated circumstances as defined in § 36-1-102;

Tenn. Code Ann. § 37-1-166(g)(4)(A) (2010). "Aggravated circumstances" are defined in Tenn. Code Ann. § 36-1-102(9) to include "abandonment, …." Tenn. Code Ann. § 36-1-102(9) (2010).

The Trial Court found and held that abandonment by Father had been proven by clear and convincing evidence, and the evidence in the record on appeal does not preponderate against this finding as discussed more fully above. As such, DCS was not required to prove reasonable efforts. In addition, Father was given notice and the opportunity to be heard and did indeed testify at trial by telephone. We find no violation of Father's due process rights. This issue is without merit.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Donald R.S., Jr.

_____
D. MICHAEL SWINEY, JUDGE

-14-